# United States Court of Appeals
## For the First Circuit

No. 21-1244

UNITED STATES OF AMERICA,

Appellant,

v.

JUAN GUERRERO, a/k/a Pawtucket,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

---

Before

Thompson, Lipez, and Kayatta,
Circuit Judges.

---

Lauren S. Zurier, Assistant United States Attorney, with whom Richard B. Myrus, Acting United States Attorney, was on brief, for appellant.
George J. West for appellee.

---

December 6, 2021

---

**THOMPSON**, <u>Circuit Judge</u>.

## Overview

"Policing is difficult and dangerous work," though sometimes "so is being a citizen trying to exercise his Fourth Amendment right to be free from unreasonable seizures." <u>See</u> <u>United States</u> v. <u>Knights</u>, 989 F.3d 1281, 1291 (11th Cir. 2021) (Rosenbaum, J., concurring in the judgment).[1]  The Fourth Amendment's core command is reasonableness.  <u>See</u> <u>United States</u> v. <u>Rodriguez-Morales</u>, 929 F.2d 780, 786 (1st Cir. 1991) (citing <u>Delaware</u> v. <u>Prouse</u>, 440 U.S. 648, 659 (1979)).  Reasonableness usually requires balance.  And balance typically requires an appreciation of the "community['s]" interest "in being free from the menace of crime" and the "individual['s]" interest "in being left alone by the police."  <u>See</u> <u>United States</u> v. <u>Serna-Barreto</u>, 842 F.2d 965, 966 (7th Cir. 1988) (Posner, J., for the court); <u>see also</u> <u>United States</u> v. <u>Hensley</u>, 469 U.S. 221, 228 (1985).

Take, for example, "investigative detentions involving suspects in vehicles," <u>see</u> <u>Michigan</u> v. <u>Long</u>, 463 U.S. 1032, 1047 (1983) — the context of today's case.  Because of the perils associated with such situations, concerns about officer safety

---

[1] The Fourth Amendment guards against "unreasonable searches and seizures" and requires that warrants be based on "probable cause."  <u>See</u> U.S. Const. amend. IV.

support a warrantless "protective" weapons "search[]" of the suspects and the area within their grab space, even if they are not under arrest — but *only if* the police "reasonabl[y] belie[ve]" the suspects are "dangerous" and "may gain immediate control of weapons." Id. at 1049-50.

Applying Long years later, we said in United States v. Lott that officers *cannot* do a "frisk for weapons . . . where, although the circumstances might pass an *objective* test," the police "were not *actually* concerned for their safety." See 870 F.2d 778, 783-84 (1st Cir. 1989) (first emphasis added). Other First Circuit panels then read that statement as requiring that officers be subjectively and objectively worried about their safety. A good exemplar is United States v. Ivery, which reasoned from Lott that "(1) the officers must have actually harbored a suspicion that the suspect was armed" and that "(2) [this] suspicion must have been reasonable under the circumstances." See 427 F.3d 69, 72 (1st Cir. 2005).

But over the many decades since Lott came on the scene, the Supreme Court has issued opinion after opinion interpreting (in various contexts) the Constitution's reasonableness command as not depending on the officer's "actual motivations" — and that is because the Fourth Amendment generally prefers "objective" inquiries over "subjective" ones. These quotes are from Whren v.

- 3 -

<u>United States</u>, for instance.  <u>See</u> 517 U.S. 806, 812-14 (1996).
<u>United States</u> v. <u>McGregor</u> signaled that <u>Whren</u>'s "reasoning" *might*
put <u>Lott</u>'s actual-fear test in serious jeopardy.  <u>See</u> 650 F.3d
813, 821-22 (1st Cir. 2011).  But because the government did not
press the matter there, we did not take up the topic.  <u>See</u> <u>id.</u> at
822 (remarking that other cases — <u>Ivery</u>, 427 F.3d at 73, and <u>United
States</u> v. <u>Nee</u>, 261 F.3d 79, 85 (1st Cir. 2001) — had also flagged
the issue without resolving it).

The issue <u>McGregor</u> (and others) spotlighted is now
squarely before us, however.

The government appeals — as allowed under 18 U.S.C.
§ 3731 — the grant of Juan Guerrero's motion to suppress evidence
seized during a protective search of a car.  Rejecting the
government's claim that Supreme Court rulings since <u>Lott</u> justify
dumping <u>Lott</u>'s actual-fear analysis, a district judge found that
while the officers had an objectively reasonable basis for the
search, they had no subjective concerns for their safety.  Still
convinced that it is right, the government asks us to ditch the
actual-fear requirement and undo the judge's suppression decision.

The government's argument implicates the "law of the
circuit" rule, which ordinarily forces us — and the district courts
under us — to follow the holdings of earlier panel decisions
regardless of how anyone might feel about them.  But as with many

rules, exceptions exist. And the one the parties fight over comes into play when "authority that postdates the original decision, although not directly controlling, . . . nevertheless offer[s] a compelling reason for believing that the former panel, in light of new developments, would change its collective mind." See United States v. Guzmán, 419 F.3d 27, 31 (1st Cir. 2005). Agreeing with the government that this exception applies, we conclude that Lott's actual-fear inquiry is no longer controlling and so reverse the judge's evidence suppression and remand for further proceedings.

## How This Case Arose[2]

### *Stop and Search*

A Saturday night in Providence, Rhode Island, October 21, 2019 — around 1 a.m. Responding to a "shots fired" call from a nearby laundromat, police officers in separate cruisers saw a dark BMW sedan racing away from the alleged crime scene. After turning around, the officers started tailing the car. One of them flipped on his lights and siren to pull the BMW over. But the sedan kept on going, carelessly making several quick turns. The car eventually stopped, however. And the officers (now joined by backup) exited their cruisers with guns drawn. Nearing the car,

---

[2] We recap the record evidence in the light most generous to the judge's ruling, noting only those details necessary to understand the government's appeal. See McGregor, 650 F.3d at 816.

- 5 -

they ordered the driver, who turned out to be Guerrero, and the passenger, who turned out be a 16-year-old minor, to get out. The minor did as directed, got handcuffed, and ended up in a police cruiser. The officers repeatedly told Guerrero to get on the ground. Finally doing as asked, he also got cuffed and put in a cruiser. A search of the BMW uncovered a magazine loaded with bullets in a backpack behind the driver's seat. Having found the magazine, the officers searched the rest of the car (including the trunk) for a firearm but came up empty.

With the search out of the way, the officers got the passenger's info, which is when they learned he was a minor. They called his mother and drove him home. But they arrested Guerrero for eluding law enforcement.

*Legal Proceedings*

That was not Guerrero's only legal trouble, however, for the feds later charged him with unlawful possession of ammunition under 18 U.S.C. § 922(g)(1). Pleading not guilty, Guerrero moved to suppress the evidence seized in the search. What happened next is a bit involved. But an abbreviated version suffices for present purposes.

The government opposed Guerrero's motion. The judge held an evidentiary hearing. And after considering post-hearing

arguments, the judge granted Guerrero's suppression request.  His analysis ran like this.

Lott, the judge wrote, says the government must "show[] . . . both that the officers were subjectively motivated by officer safety and that the motivation was objectively reasonable." Turning to Lott's objective prong, the judge found that the concatenation of circumstances — *e.g.*, "the BMW's temporal and geographic proximity to the gun shots, the direction in which the BMW was travelling (away from the location of the gun shots), Guerrero's reckless and evasive driving, and his lack of compliance with officer commands" — raised legitimate concerns about officer safety.  Plus the judge thought that the minor's temporary restraint created conditions justifying a protective search of the BMW.  Moving then to Lott's subjective prong, the judge found that the collection of facts — *e.g.*, the officers' not frisking or closely watching the minor, despite testifying that they worried for their safety, as well as their "demeanor, as documented in the body camera footage" — showed they "lacked" an actual "fear of the sixteen-year-old passenger" and "demonstrate[d] an eye towards investigation and prosecution, not officer safety."

The judge noted that after Lott the Supreme Court decided Whren, which held that "the constitutional reasonableness of traffic stops depends" on objective factors (like the violation of

- 7 -

traffic laws), not "on the actual motivations of the individual officers involved" — and thus meant that "[s]ubjective intentions" have "no role in ordinary, probable-cause Fourth Amendment analysis." See 517 U.S. at 813. And the judge also noted that our McGregor opinion suggested — without deciding the point — that Whren *might* undercut Lott's actual-fear prong. But the judge concluded that "Lott remains good (if vulnerable) law."

The government moved for reconsideration, talking up not only Whren but also Maryland v. Buie, where the Supreme Court held that officers lawfully entering a house to make an arrest can protectively sweep adjacent rooms "from which an attack could be immediately launched," see 494 U.S. 325, 334 (1990) — regardless of their subjective fears, see id. at 337 & n.1 (Stevens, J., concurring). Whren and Buie, the government continued, strongly imply that an officer's subjective belief is not constitutionally relevant when it comes to protective sweeps. But the judge did not change his mind on the actual-fear issue, pertinently ruling that "the First Circuit has repeatedly declined to reach the question of whether Lott survived Whren's broadside against inquiries into subjective intent" and that cases like Buie "involving protective sweeps of houses" (as opposed to vehicles) do not make Lott a legal "dead letter" either.

This is where we come in, with the government telling us that we should end Lott's "condition that a lawful protective sweep" under Long "requires police to demonstrate a subjective fear for their safety," and Guerrero telling us that we should find the judge's analysis to be error-free.

**Our Take**

*Standard of Review*

The government asks us to critique the judge's legal conclusion about Lott *de novo* (*i.e.*, without giving the judge's analysis any special weight). Convinced that the government did not develop its argument about Lott's viability in a timely manner, Guerrero asks us to either consider the government's Lott arguments waived or limit our review to a search for plain error. We side with the government, however.

It is true that the government did not raise concerns about Lott before the judge filed his decision. But Guerrero's pre-hearing memo did not make Lott-based suppression arguments. His two-page submission stated in conclusory terms that "[c]ourts have fashioned a few established and well delineated exceptions to the warrant requirement, in the case of an automobile search," but "none . . . apply to this case" — he did not spell out what those exceptions are. Citing Long, the government briefed the case under an objective standard. And neither the defense's nor the judge's

suppression-hearing comments clearly put the government on notice that the judge had concerns about Lott's actual-fear test — a point the judge made in his reconsideration ruling. While the government has the burden of justifying the warrantless search, "it need not . . . anticipate[] every possible suppression theory, or . . . adduce[] evidence to rebut legal arguments never articulated in defendant's suppression motion." See United States v. Vanvliet, 542 F.3d 259, 265 (1st Cir. 2008). Anyhow, Guerrero had a full opportunity to respond to the government's post-hearing arguments in his post-hearing memo.

Given all this, we believe *de novo* review is the way to go. See, e.g., United States v. Paradis, 351 F.3d 21, 28-29 (1st Cir. 2003) (applying *de novo* review to a legal issue after rejecting a waiver argument).

## *Cheat Sheet*
## *On the Law-of-the-Circuit Rule*

A key part of circuit judging is following the "law of the circuit" rule, which (as already noted) says that once a panel decides a legal issue (as the Lott panel did), that ruling usually binds later panels too — even where the succeeding panel disagrees with the prior one. See, e.g., San Juan Cable LLC v. P.R. Tel. Co. ("San Juan Cable"), 612 F.3d 25, 33 (1st Cir. 2010). The public has a right to expect a reasonable degree of predictability and certainty. See, e.g., United States v. Barbosa, 896 F.3d 60,

74 (1st Cir. 2018). And "[w]ithout the law of the circuit doctrine, the finality of appellate decisions would be threatened and every decision, no matter how thoroughly researched or how well-reasoned, would be open to continuing intramural attacks." Id.; see also Kisor v. Wilkie, 139 S. Ct. 2400, 2422 (2019) (commenting that "[a]dherence to precedent is 'a foundation stone of the rule of law'" (quoting Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 798 (2014))).

Our saying "*usually* binds" in the preceding paragraph is a tip-off that there are exceptions to when prior panel precedent controls. One applies when an intervening higher authority — a directly-on-point Supreme Court opinion, an en banc opinion of this court, or a statutory enactment — overrules the earlier panel decision. United States v. Rodríguez, 527 F.3d 221, 225 (1st Cir. 2008). Another applies when Supreme Court precedent "that postdates the original decision, although not directly controlling," provides a clear and convincing basis to believe that the earlier panel would have decided the issue differently. San Juan Cable, 612 F.3d at 33 (quoting Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir. 1995)); see also United States v. Lewis, 963 F.3d 16, 25 (1st Cir. 2020), cert. denied, 141 S. Ct. 2826 (2021). These exceptions are "narrowly circumscribed," however. Arevalo v. Barr, 950 F.3d 15, 21 (1st Cir. 2020) (quoting

Barbosa, 896 F.3d at 74).  And the situations in which they operate are "hen's-teeth-rare."  Id. (quoting Barbosa, 896 F.3d at 74).[3] This is exactly as it should be, because we here at the First Circuit

> are a court of six [active-status] members, on which it customarily takes four votes to sit en banc.  Were panels of three too prone to reverse prior precedent, we would lose the benefits of stability and invite [lawyers and] litigants to regard our law as more unsettled than it should be.

Lewis, 963 F.3d at 25.

With these preliminary principles in mind, we take on the government's bid to get around the law-of-the-circuit rule.

*Arguments and Analysis*

A heads-up first.  Our opinion is somewhat longish.  But length should not be confused for complexity.  See Mass. Sch. of L. at Andover v. Am. Bar Ass'n, 142 F.3d 26, 29, (1st Cir. 1998). Lott's days were numbered after Buie.  Yes, Buie is

---

[3] Not to sound pedantic about this, but because "hens do not possess teeth," the hen's-teeth-rare expression "impli[es] . . . that something is rare to the point of non-existence."  See *Rare As Hen's Teeth*, Idioms by The Free Dictionary, https://idioms.thefreedictionary.com/as+rare+as+hen%27s+teeth (last accessed Dec. 3, 2021).  But see generally *Hens' Teeth Not So Rare After All*, Sci. Daily (Feb. 23, 2006), https://www.sciencedaily.com/releases/2006/02/060223083601.htm (noting that "researchers say they have found a naturally occurring mutant chicken . . . that has a complete set of ivories" and "have also managed to induce teeth growth in normal chickens — activating genes that have lain dormant for 80 million years").

"distinguishable" because it involved a protective sweep of a home rather than a car. But that distinction actually cuts against Lott because privacy interests implicated by a home sweep significantly outweigh those implicated by a car sweep. See generally California v. Carney, 471 U.S. 386, 392 (1985) (holding that the Fourth Amendment allows warrantless car searches because "[a]utomobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls"). Perhaps a baseball analogy will help (at least for devotees of our national pastime). Imagine Supreme Court caselaw holds that a single *is* a good hit. Now imagine a litigant asks us to consider the status of a prior circuit opinion holding that a double is *not* a good hit. The cases would be "distinguishable," but hardly in a way that would raise any questions about the correct result. So too here. But because we take our duty to follow circuit precedent very seriously — making sure to weigh heavily the strong presumption against invoking an exception to the law-of-the-circuit rule — we explore in greater depth below the many developments that would have influenced the Lott panel to adopt a different ruling and the specific arguments to the contrary Guerrero raises.

The government invokes the second law-of-the-circuit exception, which (to put it in slightly different terms) comes to

the fore when "recent Supreme Court precedent calls into legitimate question a prior opinion" by this court. See United States v. Rodriguez-Pacheco, 475 F.3d 434, 442 (1st Cir. 2007) (emphasis and quotation marks omitted). Success under this exception is even rarer than under the first (*i.e.*, the directly-overrules exception). See United States v. Wurie, 867 F.3d 28, 34 (1st Cir. 2017) (calling the second exception the "less common" of the two). Anyway, to hear the government tell it, Whren and Buie, "both of which postdate Lott," while not controlling, "'call[] into legitimate question' Lott's viability" when "taken together." Guerrero does not agree that this exception applies. But we do.

To trace our path to this conclusion, we begin at the beginning (so to speak) — repeating some of what we said in our "Overview" section above.

Way back in 1968, the Supreme Court held in Terry v. Ohio that officers may briefly detain a person based on reasonable suspicion that he committed, is committing, or will soon commit a crime — "even though there is no probable cause to make an arrest." See 392 U.S. 1, 22, 30 (1968). Not only may they take reasonable investigative measures, but they may also frisk the person for weapons if they have reasonable suspicion that he is "armed and presently dangerous." Id. at 30. And courts "judge[]" their decisions "against an objective standard: would the facts

- 14 -

available to" them "'warrant [persons] of reasonable caution in the belief' that the action[s] taken w[ere] appropriate?" Id. at 21-22 (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)). More specifically, Terry explained, when it comes to a weapons frisk "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 27. And lest there be any doubt, the Court later explained that

> [n]othing in Terry can be understood to allow a generalized "cursory search for weapons" or, indeed, any search whatever for anything but weapons. The "narrow scope" of the Terry exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked.

Ybarra v. Illinois, 444 U.S. 85, 93-94 (1979). The sole "purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." Adams v. Williams, 407 U.S. 143, 146 (1972).

So too, because of the increased dangers in Terry stops of cars, Long held in 1983 that officers can do a protective car frisk (as it is sometimes called) if they develop some reasonable suspicion that a suspect could immediately access weapons. See 463 U.S. at 1049, 1051. Among other things, Long voiced concern that absent a protective search, "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." Id. at 1052.

- 15 -

But echoing Terry, Long said that courts assess the officers' actions based on what is "objectively reasonable" — *i.e.*, whether "'a reasonably prudent man in the circumstances'" would believe that the "suspect is 'dangerous.'" See id. at 1050 (quoting Terry, 392 U.S. at 27).

Fast-forward to our 1989 Lott decision, which is also a car-frisk case. Lott acknowledged that "Terry and Long speak in terms of an *objective* test ('reasonableness') for determining the validity of an officer's frisk for weapons." See 870 F.2d at 783 (emphasis added). But (a very big "but," actually) Lott did not view either decision as okaying a car frisk where — even though the situation "*might* pass an *objective* test" — the officers at the scene had no "*actual[]*" safety concerns. Id. at 783-84 (first two emphases added). Officers "cannot have a *reasonable* suspicion that a person is armed and dangerous," Lott declared, "when [they] **in fact** ha[ve] *no* such suspicion." Id. at 784 (bold emphasis and bracketed material added). And if they do not "have an *actual* suspicion that weapons are present" — if they were driven, say, by an unconstitutional desire to find contraband — no "ex post facto reconstruction based upon an argument of *objective* reasonableness can validate the search." See id. (emphasis added).

Turning to the case's facts, Lott said that the circumstances known to the officers before the search — *e.g.*, the

driver's running stop signs, driving away from an attempt to stop him, having bloody wrists, and making statements about the wounds that clashed with his passenger's story — "might be sufficient to justify" a "search of the car under Long." Id. at 784-85. But in the next breath Lott stated that other "reasons fatally undercut" the search's "validity." Id. at 785. For one, the officers did not frisk either defendant "upon exiting the car (or at any subsequent time) until the[] arrest[s]" — if they "*truly feared* that the two were armed and dangerous . . . they would have made sure, by a Terry frisk, that the *defendants* were not armed and then have proceeded to search the car." Id. (first emphasis added). Furthermore, the officers "directed" the search "towards finding contraband" — the police conceded that the search "was not . . . for weapons only," making it "improper under Terry and Long." See id.; see also id. at 782-83.

Successor First Circuit panels have read Lott as holding that officer-safety concerns in a car-frisk scenario must be subjectively felt *and* objectively reasonable. See (in chronological order) Nee, 261 F.3d at 85 (citing Lott, 870 F.2d at 783, 785); Ivery, 427 F.3d at 72 (citing Lott, 870 F.2d at 783-84); United States v. Diaz, 519 F.3d 56, 62 (1st Cir. 2008) (citing Ivery, 427 F.3d at 72, and noting that Ivery discusses Lott, 870 F.2d at 783-84); McGregor, 650 F.3d at 820 (citing Ivery, 427 F.3d

- 17 -

at 72, and noting that Ivery discusses Lott, 870 F.2d at 783-84).
Ivery is worth reviewing for a moment.

The Ivery defendant challenged the district judge's ruling that "the officers *actually* feared for their safety" and that their "suspicions were *reasonable* under the circumstances." See 427 F.3d at 72-73 (emphases added). Starting with the basics, Ivery held that Lott "*impose*[*d*]" the following "requirement[s] for a permissible warrantless search for weapons" in a car-frisk context: "(1) the officers must have *actually* harbored a suspicion that the suspect was armed; and (2) that suspicion must have been *reasonable* under the circumstances." See id. at 72 (emphases added and citing Lott, 870 F.2d at 873-74). From there, Ivery saw no error with the judge's finding "that the officers testified credibly" about their "*actual*[]" safety concerns. Id. (emphasis added). And after adopting the perspective of a "*reasonable*" officer at the site, Ivery also ruled that the accumulated facts — *e.g.*, the defendant's "presence in a high-crime neighborhood," his "nervousness," his "concealment of the car's rear floorboard," and his "possession of objects suggesting illegal conduct" — made the officers' concerns objectively "*reasonable*" too, just as the judge had ruled. See id. at 73 (emphasis added).

With the actual-fears issue percolating through our Circuit, the Supreme Court decided Buie and Whren — the two post-

- 18 -

*Lott* Supreme Court decisions the government says require us to "overrul[e]" *Lott*'s actual-fear requirement. On to them then.

*Buie* held that officers making an in-home arrest under a warrant could perform a warrantless "protective sweep" — defined as a "quick" and "cursory visual inspection of those places in which a person might be hiding" — to make sure no threat lurks within. See 494 U.S. at 327. They may do so when there are "articulable facts" that would justify "a reasonably prudent officer in believing" that a dangerous third party might be in "the area to be swept." See *id.* at 334. And they may do so despite the special privacy involved with a house, see *id.* at 333, and despite their having no safety "worrie[s]" — they could look just as a precaution, see *id.* at 337 & n.1 (Stevens, J., concurring). "This," *Buie* asserted, "is no more and no less than was required in *Terry* and *Long*." See *id.* at 334.

*Whren* held that courts may not discredit a traffic stop backed by probable cause simply because the officers acted pretextually — *i.e.*, using a traffic infraction as cover to subjectively investigate some other crime. See 517 U.S. at 810, 813. Beyond a few exceptions not relevant here (administrative inspections and inventory searches, for instance), "[n]ot only" has the Supreme Court "*never held* . . . that an officer's motive invalidates objectively justifiable behavior under the Fourth

- 19 -

Amendment," Whren proclaimed — but the Court has "repeatedly held and *asserted the contrary*." Id. at 812 (emphases added). In other words, according to Whren, the legality of their actions in that situation turns on objective justifications, not on subjective motivations. See id. at 813.

And Buie and Whren are hardly aberrations. In more recent decisions, the Supreme Court has repeatedly (and forcefully) played up how the Fourth Amendment's basic test is objective. A case in point is Nieves v. Bartlett, which said that "[i]n the Fourth Amendment context, . . . we have almost uniformly *rejected* invitations to probe *subjective intent*." See 139 S. Ct. 1715, 1724 (2019) (emphases added and quotation marks omitted). Another is Kentucky v. King, which said that the Court has "*never held*, outside limited contexts such as an 'inventory search or administrative inspection . . ., that an *officer's motive invalidates objectively justifiable behavior* under the Fourth Amendment.'" See 563 U.S. 452, 464 (2011) (emphases added and quoting Whren, 517 U.S. at 812). Still another is Ashcroft v. al-Kidd, which stated that because "Fourth Amendment reasonableness 'is predominately an *objective inquiry*,'" the Court "ask[s] whether 'the circumstances, *viewed objectively*, justify [the challenged] action'" — and if yes, "that action was reasonable '*whatever the subjective intent*' motivating the relevant

- 20 -

officials."  See 563 U.S. 731, 736 (2011) (emphases added except for "whatever," and first quoting Indianapolis v. Edmond, 532 U.S. 32, 47 (2000), then quoting Scott v. United States, 436 U.S. 128, 138 (1978), and then quoting Whren, 517 U.S. at 814).  And showing that the Court has said what it meant and meant what it has said, there is this passage in Florida v. Jardines:  "[al-Kidd and Whren] merely hold that a stop or search that is *objectively reasonable* is not vitiated by the fact that the officer's real reason for making the stop or search has *nothing to do* with the validating reason."  See 569 U.S. 1, 10 (2013) (second emphasis added).

According to our judicial superiors, the advantages of an objective inquiry are many — including:  "recogniz[ing] that the Fourth Amendment regulates conduct rather than thoughts," see al-Kidd, 563 U.S. at 736; "promot[ing] evenhanded, uniform enforcement of the law," see id., by avoiding "arbitrarily variable protection" of constitutional rights, see Devenpeck v. Alford, 543 U.S. 146, 154 (2004); and "allow[ing] the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment," see Torres v. Madrid, 141 S. Ct. 989, 998 (2021) (quotation marks omitted).

With Whren on the books, we have said that "[w]hether a reasonable suspicion exists" to justify a Terry frisk "is treated as an *objective inquiry*:  *the actual motive or thought process of*

- 21 -

*the officer is not plumbed*." Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004) (citing Whren, 517 U.S. at 813) (emphasis added). And with Buie and Whren in mind, we have held that judges should test the lawfulness of a protective sweep of a *home* on an *objective* standard *only*. United States v. Lawlor, 406 F.3d 37 (1st Cir. 2005), and United States v. Winston, 444 F.3d 115 (1st Cir. 2006), jump out as obvious examples.

Lawlor rejected an argument that because the officers did not act like "they feared an attack from within the house," the protective sweep crossed a constitutional line. See 406 F.3d at 43 n.8. This claim, Lawlor wrote, "miss[ed] the mark." Id. What matters is that the police were "justified in entering the house to conduct a protective sweep and that the sweep itself was appropriate in scope," Lawlor added. Id. And bowing to Whren, Lawlor held that "an officer's *subjective belief or intention is irrelevant* to Fourth Amendment analysis." Id. (emphasis added and parenthetically discussing Whren, 517 U.S. at 813).

Winston held much the same. Faced with an argument that the officers "did not actually fear for their safety" but rather used the protective sweep simply as "a pretext to search [the defendant's] house," Winston repeated that "*subjective intentions are not relevant* as long as the protective sweep was *objectively reasonable*." See 444 F.3d at 120 (emphases added and citing

Lawlor, 406 F.3d at 43 n.8, which in turn cited Whren, 517 U.S. at 813). We federal judges are poorly equipped by training and experience "to second guess the agents as to how to conduct a protective sweep," Winston remarked — though "w[e] are able" to assess "whether their actions were *objectively reasonable* given the circumstances and constraints within which they operated." Id. (emphasis added).

Where this leaves us is clear. We as a panel can and must give up Lott's actual-fear requirement.

Lott's actual-fear test runs counter to the strong modern trend in the caselaw — started by the Supreme Court and faithfully applied by us in other contexts — "'repeatedly *reject*[*ing*]' a *subjective approach*" because "[l]egal tests based on reasonableness are generally *objective*." See King, 563 U.S. at 464 (emphases added and quoting Brigham City v. Stuart, 547 U.S. 398, 404 (2006)). And with post-Lott decisions holding officers' subjective fears irrelevant in protective sweeps of homes — where privacy expectations are at their apex, see Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018) — we cannot see a good reason why subjective fears should be relevant in protective searches of autos. See generally Buie, 494 U.S. at 334, 337 (extending Terry and Long by letting officers with an objectively credible fear of danger do a visual protective home sweep to minimize that danger).

Critically too, while scrapping Lott's actual-fear analysis will align our precedent with post-Lott Supreme Court precedent, *not* doing so could frustrate the goal of "evenhanded law enforcement" — which, the Court tells us, "is best achieved by the application of *objective* standards of conduct, rather than standards that depend upon the *subjective* state of mind of the officer."  See Horton v. California, 496 U.S. 128, 138 (1990) (emphases added).  If we let Lott's actual-fear inquiry stay, this court (as best we can tell) will stand alone among the Circuits. Opinions from the Fifth, Eighth, and D.C. Circuits reject the importance of an officer's subjective fear in reviewing the constitutionality of a Long-based search (a few choice quotes):

- "This Court . . . has never held that an officer's objectively reasonable concern for safety does not justify a protective [search] for weapons where the officer has no actual fear for his safety."  United States v. Baker, 47 F.3d 691, 694 (5th Cir. 1995) (refusing to follow Lott).

- Long's reasonableness test "is an objective one" — which "does not depend upon the searching officer actually fearing the suspect is dangerous" — and so makes "such a search . . . valid if a hypothetical officer in the same circumstances could reasonably believe the suspect is dangerous."  United

States v. Plummer, 409 F.3d 906, 909 (8th Cir. 2005) (quotation marks omitted).

- "Because the [pertinent] test is objective, an officer's actual subjective motives . . . are irrelevant to the Fourth Amendment analysis of [a] traffic stop and protective search of the car." United States v. Vinton, 594 F.3d 14, 21 (D.C. Cir. 2010) (citation and quotation marks omitted).

And decisions from many other Circuits also apply an objective test to Fourth Amendment issues (again, just a sampling):

- "The Supreme Court has long rejected any attempt to inject subjectivity into the Fourth Amendment context." United States v. Weaver, 9 F.4th 129, 145 (2d Cir. 2021) (en banc) (Terry situation).

- "[T]he 'reasonable suspicion' analysis is objective; subjective motive or intent is not relevant." United States v. Goodrich, 450 F.3d 552, 559 (3d Cir. 2006) (Terry situation).

- "The reasonable suspicion standard is an objective one, and the officer's subjective state of mind is not considered." United States v. George, 732 F.3d 296, 299 (4th Cir. 2013) (Terry situation).

- The reasonable-suspicion analysis "is an objective inquiry." United States v. McCraney, 674 F.3d 614, 620 (6th Cir. 2012) (Long situation).

- "[A]s is typically the case in the Fourth Amendment context, the subjective beliefs and knowledge of the officer are legally irrelevant" — since "reasonableness remains the Amendment's touchstone, the constitutional inquiry turns on" the "objective[] reasonable[ness]" of the officer's actions. United States v. Rochin, 662 F.3d 1272, 1274 (10th Cir. 2011) (Terry situation).[4]

All of this raises the unacceptable specter of Fourth Amendment protections varying among jurisdictions, see al-Kidd, 563 U.S. at 746 (Kennedy, J., concurring) (cautioning against such a scenario) — and between similarly dangerous sets of circumstances (protective sweeps of homes and autos) as well, see Devenpeck, 543 U.S. at 154 (ditto).[5]

---

[4] Guerrero tries to distinguish both sets of cases, insisting that because the courts there considered the "totality of the circumstances," these decisions in no way undermine Lott's reliance on the officers' subjective beliefs. But cutting against his theory is that each opinion used an *objective* test, as the above snippets show.

[5] We know that "[t]he law of the circuit rule does not depend on whether courts outside the circuit march in absolute lockstep with in-circuit precedent." See United States v. Lewis, 517 F.3d 20, 24 (1st Cir. 2008). We simply mention the out-of-circuit opinions to explain our evenhanded-law-enforcement and arbitrarily-variable-protection concerns.

The bottom line then is that given the Supreme Court cases in vogue after Lott, we believe the Lott panel would (if it had the chance) reverse its view of the actual-fear issue 180 degrees.

And nothing Guerrero argues persuades us differently.

Guerrero suggests that neither Buie nor Whren count when discussing the law-of-the-circuit rule because they predate McGregor (applying Lott) and United States v. Orth, 873 F.3d 349 (1st Cir. 2017) (also applying Lott). Lott's continued viability was not at issue in either case, however. So Lott remains the key panel precedent. And (to state the obvious) Buie and Whren postdate Lott.

Also going nowhere is Guerrero's claim that Lawlor and Winston contribute nothing to the analysis. Specifically, he says that while Lawlor held that the police can protectively sweep a residence if adequate facts would lead a reasonably prudent officer to have safety concerns, the judge here found the officers actually

---

And staying with these concerns for a second, Guerrero (as the government notes) could have faced state rather than federal weapons charges. See R.I. Gen Laws §§ 11-47-5(a)(1), 11-47-2(5). And if he had and then asked a Rhode Island judge to suppress the ammo, that judge would have viewed matters through an *objective* standard only. See State v. Santos, 64 A.3d 314, 320-21 (R.I. 2013) (discussing Long and affirming the lawfulness of the "protective" vehicle "search" because the officer "was reasonable in her belief that [the defendant] might be armed and dangerous"); see also id. at 323 (repeating that the officer's "*objectively* reasonable safety concerns justified her protective search of the area near the passenger seat" (emphasis added)).

had no such concerns. But what matters is whether their subjective fears should have made a difference. And on that point Lawlor said with conspicuous clarity "that an officer's *subjective* belief or intention is *irrelevant* to Fourth Amendment analysis." See 406 F.3d at 43 n.8 (emphases added and parenthetically discussing Whren). Similarly, Guerrero claims that while Winston applied an objective test to assess the legality of a protective home sweep, Winston's ruling relied on the actual facts that the agents knew. But what he misses is that Winston said that "[r]egardless" of whether the "agents . . . actually fear[ed] for their safety," their "*subjective* intentions are *not relevant* as long as the protective sweep was objectively reasonable." See 444 F.3d at 120 (emphases added).

Guerrero next suggests that our Paradis opinion shows that Buie in no way makes Lott's actual-fear standard passé. Paradis ruled an apartment sweep illegal, saying that the officers had "no *reasonable basis* to conclude that there was a risk to officers or others" because they "had already been through the entire apartment" before starting the sweep. See 351 F.3d at 29 (second quote), 30 (first quote, emphasis added). But that is exactly the kind of dive into *objective* reasonableness Buie demands. See 494 U.S. at 327, 335-36. Significantly too, Paradis did not involve a situation where, as in Lawlor and Winston, the

- 28 -

defendant claimed the officers' subjective beliefs trumped any reasonably objective fear that prompted the sweep — the very type of claim Lawlor and Winston rejected. So Paradis does not assist Guerrero in any way.

Citing Cady v. Dombrowski, 413 U.S. 433 (1973), and Caniglia v. Strom, 141 S. Ct. 1596 (2021), Guerrero also contends that a constitutional difference exists between protective car sweeps and protective home sweeps. Not so, we say — for some straightforward reasons.

Decided in the 1970s, Cady held that officers can sometimes search autos without a warrant while performing "community caretaking functions." See 413 U.S. at 441 (observing that officers often "investigate vehicle accidents in which there is no claim of criminal liability and engage in what . . . may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute"). Cady did not involve a protective sweep of an auto under Long, which did not appear in the U.S. Reports until the 1980s — well before Buie in the 1990s. And if Cady really means that we should treat autos and homes differently for protective-sweep purposes, Buie — which extended Long's logic from autos to homes — should have come out the other way and invalidated the protective sweep there. Yet Buie does not

- 29 -

even mention <u>Cady</u>. The short of it is that <u>Cady</u> holds no sway here.

Issued last term, <u>Caniglia</u> said that "[w]hat is reasonable for vehicles is different from what is reasonable for homes," <u>see</u> 141 S. Ct. at 1600, and held that "<u>Cady</u>'s acknowledgement of these 'caretaking' duties" does not "create[] a standalone doctrine that justifies warrantless searches and seizures in the home," <u>see</u> <u>id.</u> at 1598. But <u>Caniglia</u> took care to describe the police's community-caretaking duties as "*noncriminal*" functions, <u>see</u> <u>id.</u> (emphasis added) — *i.e.*, "conducted for *non-law-enforcement* purposes," <u>see</u> <u>id.</u> at 1600 (Alito, J., concurring) (emphasis added). Perhaps that explains why <u>Caniglia</u> cited neither <u>Long</u> nor <u>Buie</u>, both of which are criminal cases. Consequently, like <u>Cady</u>, <u>Caniglia</u> has no effect on this case.

Pulling out all the stops, Guerrero argues that the officers could not protectively sweep the BMW because they had him and the passenger "under officer control at all relevant times." As support, he relies on <u>Arizona</u> v. <u>Gant</u>, 556 U.S. 332 (2009). <u>Gant</u> held that officers "may search a vehicle *incident to* a recent occupant's *arrest only if* the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." <u>Id.</u> at 351 (emphases added). But the simple response

is that "Gant explicitly limited its holding to a search-incident-to-arrest setting," thus keeping Long's standard for protective sweeps "intact," see McGregor, 650 F.3d at 826 n.5 (citing Gant, 556 U.S. at 346-51, and at 352 (Scalia, J., concurring)) — meaning Guerrero scores no points with Gant.

Insisting that Lott is not an outlier, Guerrero cites a Tenth Circuit case — United States v. Wald, 216 F.3d 1222 (10th Cir. 2000) — that he says (to quote his brief) acknowledges a "circuit[] . . . split on the issue of whether a particular officer's actual motivation is relevant to the reasonableness analysis." That Circuit, remember, holds that an officer's subjective beliefs do *not* count for Terry frisks. See Rochin, 662 F.3d at 1274. But going back to the "split," before concluding that the officers there had no "objectively reasonable suspicion that [the defendant] was armed and dangerous," Wald listed Lott and United States v. Prim, 698 F.2d 972 (9th Cir. 1983), as the two cases saying subjective motives count. See 216 F.3d at 1227. Lott obviously does not help Guerrero's the-First-Circuit-hardly-stands-alone thesis. And as it turns out, neither does Prim — a case he spends some time on.

Released months before Long, Prim said — in a Terry context, without citing any authority — that "[a]lthough the existence of reasonable suspicion or probable cause is judicially

- 31 -

viewed under an objective standard, it is a standard applied to the actual and/or perceived belief of the law enforcement officer as he either stops and detains or engages in search and seizure." See Prim, 698 F.2d at 975. Years later, the Ninth Circuit wrote — in another Terry situation, citing Prim and Lott — that "an objectively reasonable concern for safety does not justify a Terry search if the officer did not subjectively entertain that concern." See United States v. Newberry, 8 F.3d 32 (Table), at *1 (9th Cir. 1993) (unpublished). But more recently, the Ninth Circuit held — in a protective-car-sweep scenario under Long, citing Whren but *not* Prim or Newberry — that the officer's "subjective intentions" are irrelevant. See United States v. Cain, 349 F. App'x 169, 170 (9th Cir. 2009) (ruling that the "conditions . . . *objectively justified* the performance of a protective search by an officer in [the deputy's] situation" (emphasis added)). So Prim is not the difference-maker that Guerrero thinks it is.

In something of a final pitch, Guerrero claims that abandoning Lott's actual-fear requirement will "create[] a serious and recurring threat to the privacy of countless individuals." But Supreme Court caselaw outlined above already defines the scope of privacy in the protective-sweep setting: if an officer's decision to search is *not* objectively reasonable, the search cannot

- 32 -

stand — regardless of what the officer's subjective motives were. Which makes Guerrero's concern not well founded.

## Wrap Up

In fidelity to the Supreme Court cases highlighted earlier, we abrogate <u>Lott</u> to the extent it is inconsistent with this opinion, reverse the judge's evidence suppression, and remand for further proceedings.